Gerald Huckett, 3515 East, Hartford v. Loyola, University of Chicago Morning, Anderson. Morning, Counsel. Kerry Hollander for the appellant. Janine Seitz-Patridge. Scott Warner on behalf of the defendants and appelees in this matter, Loyola University of Chicago, and the five individually named defendant faculty members. Morning, Counsel. I don't know if you were here earlier when they said when your case is called, approach the podium, tell us who you represent. This is a recording device, not a microphone, so make sure it's picking up what you say. These proceedings are being recorded, and each side will have 15 minutes. Appellants should save five minutes or however many minutes you think you need for rebuttal. If I may reserve five minutes. Proceed whenever you're ready, Mr. Hollander. Thank you. I'd like to start off mentioning something said by the defense at page 8 of their brief. They said several members of the preliminary exam committee were inclined to pass plaintiff conditioned upon her advisor providing additional mentoring in areas identified by the preliminary exam committee. What actually happened, the preliminary exam members were not inclined to pass the plaintiff. They all said they were passing the plaintiff. It wasn't a majority, it was every one of them. Under Loyola's guidelines, four out of the five need to vote to pass. We had five out of the five. And these determinations that the plaintiff was going to pass the exam were not qualified in any way. The plaintiff testified. How did the doctor, how do you pronounce his name, with Dr. V? Bedantam. Yes. Did he initially say he was going to, one of the others spoke to him, and did he initially say he was going to vote to pass the plaintiff as well? Yes. The evidence was the plaintiff was told she had passed. Dr. Wolf, one of the defendants, had testified that he spoke to four out of the five, the others other than Dr. Bedantam, and the four of the five all told him that the plaintiff had passed. And then Dr. Drix, one of the other defendants, spoke to Dr. Bedantam. And Dr. Bedantam, I think his words were expressed positivity towards passing the plaintiff. So from the plaintiff's testimony, it was all five. From Dr. Wolf, it was four out of the five he spoke to. And then from Dr. Drix, it was the fifth member at least had positivity towards passing the plaintiff. When you take that evidence and compare it to what the members of the Steering Committee were told, and it was the Steering Committee that decided this matter. The Steering Committee was charged with the responsibility for this. That committee was headed by Dr. Diaz. Dr. Diaz, when I took his deposition seven years after the fact, was still under the impression that what he was told at the time was true, and he was told that the plaintiff had failed the exam. Before and independent of any charge of plagiarism, she had failed the exam. This fact separates... We're just talking about the first exam. She had two, right? Right. Okay, so what you're talking about now is the first one? The first exam, yes. All these communications dealt with the first exam that the defendants now admit was of sufficient quality. That's not what they told the Steering Committee. They misled the Steering Committee. Dr. Frank Fader, in his telephone conversation, in the inaccurate critique that was prepared, they all told the Steering Committee, and then every level of review after that. Counsel, even if that's true, let me ask you this. They did give her another exam that had, it was a separate and another exam that had nothing to do with the first one, and she failed that one, according to your opponent, fair and square. Isn't that true? So, I mean, how does that square with your argument about the fact that she might have or could have passed the first exam had they not been biased against her? I mean, she failed the second one, didn't she? We are only asking you to do what the defendants are asking you to do, and that's enforce Loyola's rules. The defendant's position is the plaintiff failed the second exam, therefore they were required to remove her from the program. Therefore, the same rules that they're relying on, the same rule, I think, states if you meet the requirements and pass the exam, you are entitled to be elevated to the doctoral program in molecular biology. They're making her pass the test twice. We could go into all the evidence. She was devastated. I'm sure she was, but, counsel, that's not exactly accurate that they're making her pass the test twice. As I understand it from the briefs and the record, the preliminary oral findings that the committee made, those were just preliminary findings. You're not asserting that once they said, oh, we think she did okay, that that's the position that they would ultimately have to take, are you? Yes. All that was left was a ministerial act. And to make clear, she took, she did her paper, she did the oral defense, which she proved she knew the subject matter because she was asked questions for hours and the defendants admit there was no issues of plagiarism in that. She answered their questions satisfactorily. And they said, you have a conditional pass. That was the conditional one or the preliminary one. You have to revise and fix AIM-4 from your paper. She revised AIM-4. They could have had her present an additional oral argument. They didn't feel it was necessary. And they informed her that she had passed the exam. And then Dr. Wolf admits that. This was after everything was done. It's a matter of signing the piece of paper from that. There was nothing left to do. But didn't the university make the argument that that was before they had discovered that she had plagiarized and by the act of plagiarism it demonstrates that she did not know the subject matter. Just by virtue of the extent of the plagiarism shows that she didn't know the subject matter. That's their argument, at least one of them. That is one of the defendants' arguments. And with all due respect, it is completely unsupported by evidence. It's contradicted because the purpose of the oral defense is for the candidate to prove her knowledge, not just of the subject matter of the test, but of molecular biology in general. That is set forth in Loyola's guidelines. And each of the defendant professors that I deposed, four of them, all admitted that was the purpose of the oral defense. And then they all admitted that she didn't plagiarize at the oral defense. Like I couldn't stand in front of you right now for two hours and plagiarize my answers to your questions. She stood there for two hours, satisfactorily answered all their questions. Counsel, as I understand their argument, she had to have passed both sections of the exam with the same degree of passability, for lack of a better term. And the plagiarism in the other section was such that they could not pass her because it was clear that the degree of plagiarism showed that she did not understand the material. That's the argument that they're making, isn't that? You're saying that as long as she passed the oral portion, even if she plagiarized in the other portion, they had to pass her because they said they were going to. Their argument isn't that the alleged plagiarism showed she didn't understand the subject. That's one of their arguments. They're claiming they couldn't tell if she understood the subject because of the alleged plagiarism. Keeping in mind most of the plagiarism that they claim was she didn't put quotation marks. She put citations to authorities. She didn't put quotation marks. And this is all in the preliminary portion of her paper. But they said we were unable to determine if she understood the subject matter. That's their argument. Well, of course. So they then gave her a second exam. I mean, I think that that's the reason that they gave her a second exam. They claimed that she failed that one fair and square. That's their argument. She proved that she understood the subject matter at the oral defense. That was the purpose of the defense. That oral defense served no purpose if it wasn't to prove she understood the subject matter. It's one thing to write a paper. It's another thing to show you understand the subject matter. And she proved that to the satisfaction of every one of them. Obviously not. They didn't pass her. Counsel, let me ask you this. We are a court, an appellate court, and there is so much case law that gives deference to the academicians in terms of making these kinds of determinations as to what is satisfactory and what is not for meeting academic standards. How, you know, if we do what you want, how do we write that so that it makes legal sense? Because, you know, the case law is replete with deference to those who understand academia better than we do. And I agree, and we're not trying to change that, Your Honor. The majority of cases deal with a person who has failed a class or failed an exam and said, I did good work. Their judgment was wrong. They should have passed me on this exam. We don't have that here. We have all of them saying her work was good. She did pass. One portion, there's two parts. As I understand it, correct me if I'm wrong, but I understand there are two parts to this exam. And after she did both parts, but before Dr. V raised the issue of plagiarism, this is in the first exam, everybody agreed that she did, that she was performing at a level that they would pass her. When Dr. V raised the question that she had plagiarized and they all went back and looked at it, that portion of the exam, she flunked that portion of the exam. And they then failed her because you have to pass both sections. That's what I understand from the record before us. So they gave her a second exam and she failed that one. Your Honor, I don't believe that's how this happened. They didn't say, okay, because of this plagiarism now we flunked her. They said the opposite to Dr. Diaz. They said to him, even before the plagiarism arose, she failed the exam. So we haven't touched the issue yet of can you have unintentional plagiarism, but let's set that aside. Let's say she plagiarized. The steering committee that makes this decision was told she failed. They didn't review whether it was proper to fail her on this exam. And are we talking about exam number one or exam number two? Still on exam number one. Unless asked, I'm only talking about exam number one. Exam number one, they said she failed anyhow, so we're making her retake the exam. Dr. Diaz said, this is a quote from page 32 of his deposition, we decided there was no grounds for any disciplinary action. So they thought they were ruling for the plaintiff when they said, go take the test again. When I told them they were actually going to pass her, but for this plagiarism issue, he had no idea, and he admitted that may have made a difference. They had the authority to order that she had passed the exam. They had the authority to do what frankly should have been done here. And under Loyola's rules, these professors were required to carefully read her draft exam before the oral defense and tell her of any issues. If one of them had done that, just one of them, and said, you're not citing your authorities the correct way, you need to clean this up, put in quotation marks here. Dr. Wolf, her mentor, specifically approved these citations. And he apparently did so without actually reading them. He just said, okay, yeah, they're fine. If one of them had said that to her, and she had put quotation marks around these few sentences. So does plaintiff have any obligation at the graduate level or postgraduate level to understand what is plagiarism and the commonly accepted definition of plagiarism? Does she have some responsibility to know that? I would say everybody. You know, it's not responsibility to know how to do citations. No, I'm just asking about plagiarism, because that's what they accused her of. Well, I'm at the graduate level and beyond, and I'm a lawyer, and I've read all these things. I don't think this is plagiarism in the first place. If she was required to make that determination, I mean, these people were teaching her how to make citations. That's, I think, what we have to focus on with her. She's a layperson. She made the citations the way she was trained to make the citations. If you look at the definition of plagiarism, it repeatedly mentions dishonesty. I've given you case authority, dictionary definitions, and testimony from the defendants that dishonesty requires intent. So to plagiarize under Loyola's rules, you have to intentionally plagiarize. You have to misappropriate the ideas of others. Failing to put quotations around some sites in the beginning portion of her paper is not intentionally misappropriating somebody else's idea. Throughout Loyola, everyone said, we can't say this was done intentionally. I would respectfully submit there is no such thing at Loyola University, at least the way these rules were written then, as unintentional plagiarism. You have to do it intentionally for it to be plagiarism. This was a learning process. She wasn't submitting this to the National Institute of Health. She was supposed to learn how to do this. They failed her. Not one of them said, do these citations differently. Can we skip ahead and talk about the test number two? Assuming everything you say is true and they really missed the boat and they should have, is that remedied by giving her a second opportunity to start with a clean slate? No. Why not? Well, it's a different test, different issues. You know, we've avoided getting into the judgment of the subject matter that they could give her a more difficult subject matter. There was evidence she was devastated. She was branded a plagiarist and failed in this in front of all of her peers. She was devastated that she had to do the second exam. It wasn't within the subject matter of what she was learning in her mentor's lab, which it was required to be. There's all sorts of other issues. But what I try and keep coming back to, rather than saying in their judgment they should have given her something different on the second test, what I keep coming back to is the rules say if you pass the test the first time, you get promoted to candidacy in the doctoral program. You don't have to do it again. And she did pass that test. The plagiarism issue was the only reason she didn't. I've cited what I think is a very telling case, it's Hess versus Hartford Life, where the plaintiff had to prove that the conduct was arbitrary and capricious. The fact finder, who had to determine if in that case it was payment on an insurance policy, was given incorrect information. And the court said, as a matter of law, that's arbitrary and capricious. This person has to make a decision. He wasn't given the accurate information. His decision, by definition, is arbitrary and capricious. This is the same thing here with the steering committee and then all the levels of review beyond that. They never knew what the actual issue was. The issue that should have been presented to the steering committee was, Ms. Seitz-Partridge passed the exam. It was satisfactory. Then this plagiarism issue arose. We decided the remedy for what we branded as plagiarism was to have to retake a new test. Let me ask you, the university has a level of review. They have their own internal review process, and I think it's a three-tiered process. She completed that three-tiered process. So the argument that you're making to us was made to the three levels of academicians in the university who are charged with the responsibility for resolving these questions, a question of whether the plagiarism was intentional or not intentional, whether dishonesty was involved. All of those are issues that were presented to the three-tiered review process. Not one tier got that issue. Ms. Seitz-Partridge obtained the critique with the misleading information in discovery in the lawsuit. They refused to give it to her during this process. She had no idea that these levels of review were being told that she had actually failed the test before the plagiarism issue arose. So what happened in the steering committee, where they thought they were ruling for Ms. Seitz-Partridge, they could have expelled her from the school. That's why it went to the steering committee. So what are you saying took place in the review process? The review process, just like here, I can't give you new evidence. They don't get new evidence in their review process. They have the record in front of them. The record that they had, this critique, and the information given by Dr. Frank Fader to Dr. Diaz was she failed the test anyhow. Just have her retake the test. It's not even a punishment, and they didn't intend to punish her at all. Dr. Diaz is clear in that. He didn't want to give her any punishment. He thought he was ruling for her. In the litigation, we got the critique. The critique led to the ‑‑ I got in the case kind of late. The only new discovery I took was Dr. Diaz's deposition, because he was the one who received the critique. And then Dr. Diaz's admission, not against himself, because he didn't do anything wrong, and this isn't condemning the whole university. It's this group of people. But his admission seven years later that he never knew Ms. Seitz Partridge's work was of sufficient quality to pass, he had been told the opposite. That was his assumption. Counsel, they are arguing that she did fail the first test, but it was almost part of their argument, if I understand it, certainly an inference. But, you know, to try and make this fair and square, we gave her a second test, which she then failed also. So they are not agreeing with you that she passed the first test. That's not their argument. If I could be very specific, then, because they didn't do anything fair and square with her. They did something very unfair to her. What they told the steering committee, Dr. Diaz, and every level of review was, even before plagiarism arose, Ms. Seitz Partridge was going to flunk this exam. There's no question that that's what they told him. That's what Dr. Diaz admitted. Even before plagiarism arose? Before the issue of plagiarism arose, they had decided she was failing the exam. Dr. Diaz specifically told me, in the deposition, that Dr. Frank Fader, the head of the prelim committee, told him that in a telephone conversation. And he also said, from the critique, that's what he understood too, where they only talked about her deficient work. I asked them why they didn't talk about the work she did well, and the answer was, I can't explain that. So there's no question that the steering committee was operating under the belief she had failed the exam. They weren't even called upon to decide if that was proper or not. It turns out the failure of the exam was a sanction from the preliminary exam committee for the alleged plagiarism. Nobody reviewing that was aware of that. It was a given fact she had failed, and now their decision was. But that's a distinction without a difference, isn't it? The university, the academicians get to determine within the parameters of their own guidelines what's plagiarism and what isn't. And if they decide that it's plagiarism, and based on that she isn't doing, she has failed the exam, you know, I'm. . . I'll be happy to answer that. Number one, there's two issues there. Do I have to prove plagiarism to win in this case is issue number one. Two, if I did have to prove plagiarism, that there was not plagiarism, did I prove that? So I don't have to prove that she didn't plagiarize. With all due respect, I don't think that's part of this, because if the steering committee had been told she plagiarized, and in fact the steering committee reached their own conclusion of this unintentional plagiarism, you know, if you knew she was going to pass, but then you had this plagiarism issue, could the outcome have been different? Dr. Diaz said, yeah, we could have ordered that she pass the exam. We could have simply ordered the prelim committee to have her redo these citations, teach her how to do it, and then correct it. So even if we accept that there's such a thing as unintentional plagiarism, still the steering committee and then all the other levels of review never reviewed the right issue. They reviewed, she failed, should we impose some additional sanction? They should have reviewed, she passed, she was sanctioned for the alleged plagiarism, what's the appropriate sanction, if anything? She never got the review she was entitled to. The steering committee never understood what it was they were reviewing under this Hess case that is per se arbitrary and capricious. Second, I don't think, you know, even if I had to prove she didn't plagiarize, we can do that objectively. It's a matter of academic judgment. Give somebody a test, did they have academic judgment if she passed it or didn't pass it. Whether plagiarism requires intent or not is something we can view objectively. We can look at the definition of plagiarism in Loyola's rules where it repeatedly requires dishonesty and misappropriation, and we can realize that that requires intent. Mr. Hollander, could I move to another point you raised in your brief? Yes. Specifically under 2615, the court dismissed the defamation per se count. Yes. According to what I've read in the record, this allegation arises because some sort of secret memo was written by a Mr. Dirks that went to the steering committee, and that raised the whole plagiarism and her not knowing her subject to the committee. Yes. I've looked at the briefs, and the FLE hasn't shown whether if, in fact, this was a defamation, whether or not it was privileged or not. Would this have been a privileged defamation if it was defamation? No. And that one communication... I mean, does she sign off on anything during this process, releasing the university on anything like this? No. And we actually alleged three separate defamations. It's the same topic, that misstating the fact, saying she failed, even independent of the plagiarism allegation. But it was repeated three times. It was in the critique prepared by Dr. Dirks. Okay, well, as far as it exists, but I'm interested in knowing whether or not the university is privileged in this communication. No, they're not. They haven't alleged that they are. And one of the communications, the third one, was simply one of the doctors telling a student that this is what had happened. And, you know, even if the others were privileged, there's certainly no privilege for just, you know, like water cooler talk for this professor to tell a fellow student that Ms. Seitz-Partridge had committed blatant plagiarism. And she, you know, so there's multiple... That privilege would also have been an affirmative defense. Was that raised in the lower court? It was not. At least if it was raised in papers, it was never argued or briefed or that, anything like that. Thank you. And that actually arises two ways, Your Honor, if I might. There was the defamation count initially, and Judge Goldberg dismissed that on a 2-6-15, saying we don't extend this to a student. And Ms. Seitz-Partridge wasn't just a student. And then I moved to file and amended a six-amendment complaint. I'm aware of the... With more specific facts. Anyhow, Your Honors, we're asking that this summary judgment be reversed because there are numerous questions of fact in this case. Not only for remand for trial as to damages, but the injunctive part of the case had been dismissed. And I know I've got to sit down, so I don't want to go through a long argument about why I disagree with that. But with all due respect, I think the case should go back. And upon hearing evidence at trial, the court should be able to determine what, if any, injunctive relief would be appropriate in this case. Thank you. Thank you. Thank you. Mr. Warner. May it please the Court. Scott Warner on behalf of all of the appellees in this matter, Loyola University, and the five faculty members who were responsible for evaluating the plaintiff's academic performance. In sum, I'd like to just start by clarifying a few facts as they relate to the summary judgment ruling that the trial court made on both of the breach of contract counts. It is true that a majority of the members of the PEC, that's the committee that was charged with evaluating Ms. Seitz-Partridge's academic performance, were inclined to pass her on the first exam. The key point here, however, is that the only time that they were inclined to pass her on the exam is before they had learned of the plagiarism. Once the plagiarism arose, plaintiff herself testified at deposition that her exam was placed on hold. The PEC carefully evaluated the evidence of plagiarism, determined that she had, in fact, violated Loyola's definition of plagiarism. And what's that, counsel? Does Loyola's definition of plagiarism include an element of dishonesty or intentional conduct? It does not, and the trial court properly found that there was no requirement of intent. The definition simply says there's no reference to intent. The definition simply says a use or appropriation of ideas without sufficient public acknowledgement that the idea is not one's own. There's no requirement of intent. In fact, the determination as to whether or not this particular exam violated the institution's plagiarism policy was, in fact, in and of itself an academic judgment. Under this district's decisions in Harris, Billett, and Frederick, courts are precluded from reviewing academic decisions absent some evidence of arbitrary and capricious conduct. Mr. Hollander made some points about what information was shared with the Steering Committee, and to be absolutely clear about the information that was shared with the Steering Committee, the Steering Committee was not told that the plaintiff was going to fail the exam. What the evidence shows, and what the documentary record shows, is that there was information provided by the PEC to the Steering Committee, including all of the information with respect to the plaintiff's first exam, including the evidence of the plagiarism. So not only did the PEC determine that the plaintiff had committed plagiarism, when that information was then independently evaluated by the Steering Committee, the Steering Committee also made its own independent judgment that the plaintiff had committed plagiarism. So the only time that the PEC was inclined to pass the plaintiff, or a majority of its members had decided to pass the plaintiff, was when they thought they were reviewing the plaintiff's own work. Once they determined that they weren't reviewing the plaintiff's own work, and that substantial portions of her exam had been copied from original scholarly articles without proper attribution. Counsel, didn't Dr. Frank Fader state that independently of the plagiarism issue, he thought that the plaintiff was, her work was not of sufficient quality to receive a passing grade anyway? Didn't he say that in his deposition? There's no reference to the word independent, and in fact Dr. Frank Fader's deposition is not even part of the record as far as I know. His deposition was taken, but Dr. Frank Fader's deposition is not part of the record. What Dr. Frank Fader said is that plaintiff's document referring to her first exam was not of sufficient quality, and that they had discovered plagiarism. Once the issue of plagiarism arose, the PEC and the Steering Committee both agreed they simply couldn't tell how well she understood the material, and they gave her a second chance. So rather than failing her finally, dismissing her from the program, they gave her a second chance to take another examination, and when there was no plagiarism at issue, the plaintiff failed for a second time. So the issue that was presented to the Steering Committee, and the reason why this whole matter went to the Steering Committee, and this is reflected in the letter that Dr. Frank Fader sent to Dr. Diaz, along with the copy of the plaintiff's exam, the evidence of plagiarism, the PEC wanted the Steering Committee to weigh in on how to proceed now that the plaintiff had failed the exam because she had plagiarized. So once this plagiarism arose, her exam was placed on hold, she failed, they went to the Steering Committee, the Steering Committee weighed in and said, we agree, we can't tell whether she did it intentionally or not, but we agree that this is evidence of plagiarism. We agree that having her take a second exam is the appropriate way to proceed, and that is, in fact, what happened here. And, of course, the plaintiff wasn't dismissed until she failed the exam for a second time. What my opponent also does not acknowledge is that there's also undisputed evidence in the record, in the deposition testimony of Dr. Drix and Dr. Keating in particular, where they make very clear that, yes, the committee was prepared to pass her until they realized that there was this evidence of plagiarism, but there were also serious concerns that remained about her performance. And, in fact, with all due respect to my opponent, this notion that Dr. Vedantam had significant positivity towards the idea of passing plaintiff, actually what she said, what Dr. Drix said, is that Dr. Vedantam had significant positivity towards the idea of putting a letter in plaintiff's file. This was before the issue of plagiarism arose. Putting a letter in the plaintiff's file saying, we have these concerns about your performance, leaving plagiarism out of it for a moment, but we're prepared to pass you, but we want to make sure that your advisor and mentor, Dr. Wolf, continues to pay close attention to these issues going forward. So it's not as though the committee was prepared to pass her with flying colors by any stretch. There were these issues, but the bottom line is that once this plagiarism issue arose, the PEC, the steering committee, that's eight faculty members total, exercised their academic judgment in an appropriate and rational way, and they determined in a very reasonable manner, this is the antithesis of arbitrary and capricious conduct, that the thing to do was to require the plaintiff to take a second exam, and it was only after that point that the plaintiff failed again, and she was dismissed from the program. Again, under Harris, Frederick, Billett, at every stage, the well-reasoned decisions of this district have dismissed these claims. Harris involved a motion to dismiss. Frederick involved a motion for summary judgment. Billett, based on Billett, I would submit that had the summary judgment motion been denied and had this case gone to trial, it would have been reversible error. In Billett, there was a trial, and the court stepped in and said, there simply was not any evidence of arbitrary and capricious conduct. The only time that there's evidence of arbitrary and capricious conduct sufficient to create a fact issue is when a decision is made for some non-academic reason. Here we have quintessentially academic judgments from step one all the way through the process. Cases, for example, DeMarco is a decision from this district, where the court said the institution engaged in arbitrary and capricious conduct because they withheld a degree from a student who had completed all of the degree requirements because of that student's ability to make a financial contribution. Or the Johnson case, which is a Fourth District case that Mr. Hollander cites in his brief. Another example, they withheld a degree from a student who had completed all of the degree requirements because they thought the student might be a homosexual. That's arbitrary and capricious conduct. Here the plaintiff has to try to create a fact issue showing that there was no discernible rational basis for the decisions that Loyola and its faculty members made. I would submit that there's simply no evidence of that. To the contrary, the faculty members continued to exercise their academic judgment throughout this matter. And for that reason, the summary judgment on both of the contract counts should be affirmed. As this court, I'm sure, is aware, the defamation per quote claim, summary judgment was also entered on that claim, but that's not at issue in this appeal. Well, let's get to the defamation per se, since you've got me in that direction. Yes. Were these communications privileged? And if they were, you never raised that as an affirmative defense. I don't have our answer, and it may very well have been raised as an affirmative defense. Our main arguments and the main basis for the trial court's ruling that the defamation per se claim should be dismissed with prejudice, and that was a decision back in February of 2006, that the plaintiff failed to establish that she met one of the established categories for defamation per se. I think there is an argument that this communication was privileged. The communications from the faculty members who comprised the PEC to the steering committee, the evaluations of the plaintiff's exam performance, I think there is a strong argument that those communications were privileged. You haven't shown it in your briefs. We haven't raised it in our briefs, and we raised three other arguments instead, all of which would be sufficient to uphold that dismissal. First, that the plaintiff did not meet any of the categories of defamation per se. Second, that all of these academic judgments were really statements of opinion, not statements of fact in terms of her exam performance. Well, I mean, to accuse an academic of plagiarism, you're saying that's not defamation per se? Saying it's not defamation per se because under the law... I mean, it goes to her honesty or integrity within her position. Sure, and this was the exact issue that the trial court raised and decided in resolving the defamation per se claim. That is, that the plaintiff was a student working towards a degree to become a member of a profession, but she was not yet a member of a profession, nor was the statement related to the discharge of her employment duties. She was not an employee. She can't simply label herself as an employee. She was a Ph.D. student seeking a degree. Well, the court dismissed pursuant to 615. Correct. And it appears that in count four, she's well pleaded a fact issue, the fact being, in her opinion, she's a scientific professional. And at the pleading stage, we take all statements like that in the light most favorable to the plaintiff. Well, that relates... Yes, the court didn't agree. The court threw her out on that. Correct. The court threw her out, finding that she had not established, that the allegations in the complaint did not establish that she was a member of a profession or that the statements related to the discharge of her employment duties. If she well pleads it, we have to give it to her for the pleading purposes. But if I understand the trial court's decision correctly, it was that as a matter of law, a student is not a member of a profession, and as a matter of law, a student pursuing a Ph.D. is not engaged in the discharge of her employment duties. So it was a legal question, as I understand it, that the trial court was making and finding as a matter of law that she did not fit within one of the established defamation per se categories. Is that why you didn't raise a response to that in your brief? Well, it is addressed in our brief. In terms of pleading and affirmative defense. Well, we address the issues of truth and opinion in our brief, and we feel that those are also additional grounds that would support the denial of the motion to reconsider. And this raises an interesting procedural question. There's no argument in the brief about the propriety of the 2615 decision. The issue, as I understand it, raised in the brief, is that the denial of the motion to reconsider was inappropriate, which is a different issue. And I would submit that the denial of the motion to reconsider. Well, it also arises when they came before the court to file a Sixth Amendment complaint where I think they were trying to beef up her status by stressing her employment. Correct. But these are issues the court decided in dismissing this case and bringing it before us. Correct. And in addition to the legal question of whether the plaintiff falls within any of the recognized categories of defamation per se, these academic judgments, again, I would say, are statements of opinion, not statements of fact. And also they were true. The evidence of plagiarism. Well, truth would be a defense. Exactly. And we argue that in our brief. And truth is a defense here. I mean, the evidence of plagiarism was considered not only by the PEC. It was also considered by the Steering Committee. You have eight faculty members at Loyola unanimously deciding that this was, in fact, plagiarism under Loyola's definition of plagiarism where there's no requirement of intent. They made that academic determination. And, therefore, those statements are true as well. But that would be a jury or a fact finder opinion. At the pleading stage, if she alleges it and it's well pleaded, then it goes before a fact finder. You don't throw out the complaint if it's well pleaded. Again, I think the main rationale was this legal question of whether the plaintiff fell within any of the categories of defamation per se. And that was an issue, I would submit, that was appropriately decided at the pleading stage. I think in considering, in ruling on the motion for leave to file the sixth amended complaint, I would argue that the trial court properly exercised its discretion, given the nature of the evidence on a complete record, leaving aside sort of the timeliness of the amendment, but that, based on the whole record, it was an appropriate exercise of discretion to deny leave to amend when you have this evidence of truth as well. So I think there's the legal issue as to whether or not she fell within any of the categories of defamation per se. Also, the information that was available to the trial court with respect to whether it properly exercised its discretion in deciding to deny the request to file the sixth amended complaint. With that, I conclude my remarks and request that all of the rulings of the trial court be affirmed in their entirety. I'd be happy to address any other questions the court may have. Thank you, counsel. Thank you very much. Mr. Hollander, brief, brief rebuttal, please. I will be very brief. Thank you. Justice Cunningham asked Mr. Warner if the definition of plagiarism included a requirement of intent or dishonesty. His answer was the definition doesn't mention intent. He didn't answer the dishonesty question, and they've never answered the dishonesty question. And I've provided case law definitions and testimony from the defendants. And it's uncontradicted that dishonesty requires intent. The cases say negligence, carelessness, mistakes. Those are not dishonest. Dishonesty requires intent. I'm not asking you to overrule anybody's academic judgment. The academic judgment of everybody at Loyola who reviewed this was we can't say the plaintiff acted intentionally. If she didn't act intentionally, she didn't commit plagiarism under Loyola's definition. He asked about comments Dr. Frankfeder made to Dr. Diaz, and the response was Dr. Frankfeder's deposition isn't even in the record. Mr. Hollander, do you have a copy of the Loyola definition there? Can you read it to the court, please? I'm sorry, I don't have it. Mr. Warner may. Do you have a copy of it, Mr. Warner? I'll show you. It's titled Statement on Academic Honesty. And the subheading is Boundaries of Academic Honesty and Dishonesty. And it says, Papers, plagiarism is the appropriation of gain of ideas, language or work of another without sufficient public acknowledgement that the material is not one's own. The following acts are regarded as such violations. And then I would need my glasses to read these because it's very small. Thank you. That's sufficient. Anyhow, it's true, Dr. Frankfeder's deposition wasn't mentioned. It's Dr. Diaz's deposition. Dr. Diaz said, Dr. Frankfeder called me and told me the plaintiff had failed the exam independent of any allegation of plagiarism. And then Dr. Diaz explained that's why they only reviewed whether she should have some penalty beyond retaking the exam. Counsel also told you that the prelim committee decided the punishment. That's not correct. The prelim committee makes recommendations. It's the steering committee that was never given the correct information that made the decision. On the defamation issue, I do note there's a W-2 given to her with taxes and Social Security taken out. Besides all the other evidence, she's working, she's under their control. Is that proof that she's a member of the profession? The fact that she is working, does that mean that you are a member of the profession? Well, you don't have to be a member of the profession for defamation per se. It has to be in your employment, your business employment profession. She was employed there. She wasn't a mere student. The 2615 treated her like an undergraduate student. It didn't take into account whatsoever she was employed. However, did the alleged defamation arise from her position as an employee? Was she student teaching or something? Or did it arise over her pursuing her master's or Ph.D.? It doesn't arise out of her employment. It does. It was all intertwined because, in fact, one of the required classes she had to take was her work for Dr. Wolf as his lab assistant. They call it a class, but it's actually working there. And the topic for her prelim exam had to come from work that she was performing in Dr. Wolf's lab. So by definition, it was tied into that. It's all part of the same. And the people she was defamed to are the people she was working with, co-students with. I mean, it wasn't like, well, you're working with me, but you're also a student, so we're just going to say you're a fellow student. It was her co-workers, too, that she was defamed in front of. Yeah. I promise I'll be brief. Thank you. Thank you very much, both counsels. You have a good-spirited argument. The matter will be taken under advisement.